**Nathan v. Nathan**

C.P. of Philadelphia County, February Term 1998, no. 0811.

*Howard J. Levin,* for plaintiff.
*Joseph W. Cunningham,* for defendant.

ACKERMAN, *J.,* July 24, 2000—After a six-day jury trial, the jury entered its verdict as follows on the following issues:

"At the conclusion of all evidence and on motion of the defendant, Glen Albert Nathan D.C., a directed verdict was entered in behalf of said defendant and against the plaintiff, Lauren Sue Sostman Nathan, as to Count II of plaintiff's complaint alleging breach of fiduciary duty; as to Count III of plaintiff's complaint alleging violation of the Pennsylvania Security Act; and as to a por-

tion of Count I of plaintiff's complaint dealing only with fraudulent nondisclosure.

"The issue of fraudulent misrepresentation and punitive damages went to the jury; and the jury returned the following verdict:

"The jury found for the plaintiff, Lauren Sue Sostman Nathan, and against the defendant, Glen Albert Nathan D.C., in the amount of $723,000, representing compensatory damages due to the plaintiff.

"Before the punitive damage stage of the litigation went to the jury, the parties settled the punitive damage portion of the case and stipulated to the entry of a verdict in behalf of the plaintiff, Lauren Sue Sostman Nathan, and against the defendant, Glen Albert Nathan D.C., in the sum of $300,000 for punitive damages.

"The total verdict, therefore, by the jury and as stipulated, aforesaid, is for the plaintiff, Lauren Sue Sostman Nathan, and against the defendant, Glen Albert Nathan D.C., in the total amount of $1,023,000."

On January 21, 2000, defendant filed a motion for post-trial relief in the nature of a judgment n.o.v. or in the alternative, a motion for new trial and, thereafter, plaintiff responded thereto.

The defendant's *original* motion for post-trial relief alleged the following:

(1) Judgment n.o.v. is appropriate because the record does not support the jury's finding that defendant made a fraudulent misrepresentation.

(2) A new trial is appropriate because the verdict is against the weight of evidence.

On April 24, 2000, defendant's new counsel filed a brief in support of post-trial motions; and on April 26, 2000, defendant, through his trial counsel, filed a peti-

tion for leave to amend his post-trial motions to add the following alleged errors:

(1) A new trial is required because plaintiff failed to lay a foundation for the admission of exhibits P-18 and P-41, two charts entitled "Summary of financial requires for initial listing" in that there was an insufficient basis that defendant was aware of the substance of those charts and/or such evidence was unduly prejudicial.

(2) The lawsuit is barred by the divorce decree by reason of 23 Pa.C.S. §3332, 42 Pa.C.S. §5505, the doctrine of res judicata and because this court did not have subject matter jurisdiction to hear the case in the first instance.

Because the issue of subject matter jurisdiction can be raised at any stage of the litigation, this court signed an order granting the petition for leave to amend the post-trial motion and to accept defendant's supplemental motion for consideration.

After argument and hearing and upon consideration, this court ordered that:

(1) The defendant's motion for post-trial relief is denied.

(2) Judgment is entered in accordance with the verdict of the jury as to compensatory damages as well as the stipulated verdict of the parties as to punitive damages in favor of the plaintiff, Lauren Sue Sostman Nathan, and against the defendant, Glen Albert Nathan D.C., in the sum of $1,023,000.

Defendant filed an expedited motion for reconsideration, limited to this court's jurisdiction over this dispute, which this court denied on June 9, 2000, and defendant filed the instant appeal.

## PROCEDURAL FACTS

The essential procedural facts giving rise to this appeal are as follows:

On February 4, 1998, plaintiff instituted this action against her former husband, the defendant, Glen Albert Nathan, by writ of summons in the Court of Common Pleas, Philadelphia County. In addition, plaintiff named as defendants, David Grunfeld, Esquire, Susan Peikes Gantman and Sherr, Joffe and Zuckerman P.C. On March 25, 1998, defendant Nathan wrote that an entry of appearance and demand for jury trial was being filed.

On September 1, 1998, an amended complaint was filed alleging causes of action based upon fraud, tortious nondisclosure, and breach of Pennsylvania Security Regulations as well as punitive damages.[1] Defendant Nathan filed an answer to the amended complaint along with new matter on October 20, 1998.

The gist of the amended complaint was that the defendant fraudulently misrepresented the value of the stock the couple owned in the ABC/ABFS Company. Plaintiff averred that defendant told her the stock was worth, at best, $100,000—what they had paid for it—or at worse, nothing, and that she was getting a great deal. The complaint averred that in reality, the ABC/ABFS Company was poised to go public with an initial public offering and the value of the stock was actually in excess of $2.6 million ($18 per share x 147,824 shares). (See amended complaint, ¶¶5-48.) Plaintiff averred defendant knew the stock was worth far more than he represented by virtue

---

1. Defendants Gantman and Sherr, Joffe and Zuckerman were not included in the complaint. Plaintiff later agreed to dismiss defendant Grunfeld.

of his being present at board of directors meetings at the company from the time the investment was made in 1988 throughout 1995. (Amended complaint, ¶¶21 and 50.) Discovery was conducted in this case.

On August 6, 1999, defendant filed a motion for summary judgment, which was timely responded to by plaintiff and denied by the Honorable Judge Flora Barth Wolf on October 19, 1999. While Judge Wolf did not expressly set forth her reasons for such denial, counsel for defendant suggests in footnote 6 in its brief that "the court has already passed on it . . ." (presumably subject matter jurisdiction).

On January 7, 2000, jury selection occurred, and on January 10, 2000, trial commenced before this court. After defendant's motion for directed verdict, the case went to the jury on plaintiff's common-law fraudulent misrepresentation theory. The jury answered a detailed verdict sheet finding all elements necessary for finding against the defendant on fraud, awarded compensatory damages in the amount of $723,000 (N.T. 1/13/00, p. 50) and answered affirmatively that punitive damages should be awarded. (N.T. 1/13/00, p. 50.)

Following the verdict, plaintiff was granted leave to take the deposition of defendant and have him produce documentation concerning his assets for the punitive damages trial which was to resume the next day.

The following day, January 14, 2000, a settlement of $300,000 for the punitive damages was reached between the parties and placed on the record (N.T. 1/14/00, pp. 1-13), for a total verdict by the jury and as stipulated in favor of plaintiff, in the total amount of $1,023,000. On January 20, 2000, defendant filed post-trial motions

which did not raise its res judicata defense, its subject matter jurisdiction defense, or its objection to plaintiff's exhibits P-18 and P-41. Plaintiff timely filed an answer to defendant's post-trial motions.

On April 24, 2000, defendant's new counsel filed a brief in support of post-trial motions, and on April 26, 2000, defendant, through his trial counsel, filed a petition for leave to amend its post-trial motions to add the res judicata/subject matter jurisdiction defense, and the objection to plaintiff's exhibits P-18 and P-41.

Because the issue of the subject jurisdiction of this court is pivotal, we will examine that issue at the outset.

### A. *No Subject Matter Jurisdiction Exists* *For This Court Over This Case*

Defendant argues that this lawsuit is barred by the divorce decree entered by the Montgomery County Court of Common Pleas on March 15, 1996 in *Nathan v. Nathan,* no. 93-11191 (C.P. Montgomery Cty.) as follows:

"Decree

"And now March 25, 1996, it is decreed that Lauren Sue Sostman Nathan and Glen Albert Nathan are hereby divorced from the bonds of matrimony.

"It is further ordered that:

"[x] The property settlement agreement between the parties, dated February 14, 1996, and attached to this decree is hereby incorporated by reference as fully as though the same were set forth herein at length. Said agreement shall not merge with, but shall survive this decree.

"[ ] This court retains continuing jurisdiction to resolve the claims of either party to equitable distribution alimony, counsel fees, costs, expenses, or related claims which shall be listed for hearing.

"[ ] No other relief is granted.

"By the court:

"/s/William J. Furber, J."

Defendant argues that the decree "finally and conclusively resolved the parties' respective interests in the stock in ABC/ABFS. Although certain procedures exist by which plaintiff could have sought to undo the terms of the postnuptial agreement and decree, she may not make an end-run around those procedures by simply filing a separate lawsuit. The failure to avail herself to the prescribed procedures for challenging the decree is fatal and this lawsuit is barred by 23 Pa.C.S. §3332, 42 Pa.C.S. §5505, and the doctrine of res judicata. (Citing *Ratarsky v. Ratarsky,* 383 Pa. Super. 445, 557 A.2d 23 (1989).)

23 Pa.C.S. §3332 Opening or vacating decrees, provides as follows:

"A motion to open a decree of divorce or annulment may be made only within the period limited by 42 Pa.C.S. §5505 (relating to modification of orders) and not thereafter. The motion may lie where it is alleged that the decree was procured by intrinsic fraud or that there is new evidence relating to the cause of action which will sustain the attack upon its validity. A motion to vacate a decree or strike a judgment alleged to be void because of extrinsic fraud, lack of jurisdiction over the subject matter or a fatal defect apparent upon the face of the record must be made within five years after entry of the final decree. Intrinsic fraud relates to a matter adjudi-

cated by the judgment, including perjury and false testimony, whereas extrinsic fraud relates to matters collateral to the judgment which have the consequence of precluding a fair hearing or presentation of one side of the case."

A fair reading of the divorce decree by Judge Furber makes it clear that the property settlement agreement between plaintiff and defendant does not "merge" with the decree and shall "survive" the decree.

The Montgomery County Divorce Court did not by its decree retain continuing jurisdiction to resolve the claims of either party to "equitable distribution" or "related claims," nor did Judge Furber indicate that "no other relief is granted."

The action before this court was not a motion to open a decree of divorce or annulment as governed by 23 Pa.C.S. §3332, nor is the limitation period for seeking to open a decree of divorce or annulment as set forth in 42 Pa.C.S. §5505 in question here.

The language of paragraph 17(b) of the postnuptial agreement appears to specifically authorize the filing of this suit. Indeed, the action before this court for fraudulent misrepresentation of essential elements under the terms of the postnuptial agreement is for "redress" of any rights as may be present under that agreement. It is significant that the language of paragraph 17(b) is not limited to a right to "enforce" that agreement.

The case of *Hess v. Hess,* 397 Pa. Super. 395, 580 A.2d 357 (1990) involved, as here, an action by an ex-wife against an ex-husband for fraud in connection with husband's nondisclosures as to the value of certain properties in negotiating the marital property settlement agreement. The Court of Common Pleas of Delaware County,

Civil Division, entered judgment on jury verdict and ex-husband appealed. The Superior Court did not, on its own motion, as it could have if appropriate, hold that the Court of Common Pleas of Philadelphia County did not have subject matter jurisdiction.

Neither 23 Pa.C.S. §3332 by its terms, nor the decree of the Montgomery County court by its terms, prohibit this court from exercising its jurisdiction over the class of case before it.

The case of *Ratarsky v. Ratarsky,* 383 Pa. Super. 445, 557 A.2d 23 (1989) is not applicable as it involved an action by a former wife to reopen a divorce decree. The discussion of "extrinsic fraud" under the Divorce Code, a statutory term under 23 Pa.C.S. §3332, is also not applicable to a common-law fraudulent misrepresentation case as is before this court.

The case of *Wareham by Trout v. Wareham,* 716 A.2d 674, 676 (Pa. Super. 1998) also involved a property settlement agreement that was incorporated in a divorce decree but not merged into that decree. The *Wareham* opinion makes it clear that under those circumstances "the agreement survives as an independent contract which . . . is enforceable by traditional contract remedies." (Citing *Nessa v. Nessa,* 399 Pa. Super. 59, 581 A.2d 674 (1990).)

In *Nessa v. Nessa, supra,* that court held that since the contract survived it could be "enforced only in accordance with the law regulating contracts through proceedings of law or in equity." *Id.* at 64, 581 A.2d at 676.

The case of *Sonder v. Sonder,* 378 Pa. Super. 474, 549 A.2d 155 (1988), citing *Litwack v. Litwack,* 289 Pa. Super. 405, 433 A.2d 514 (1981), "(court may not alter contract absent mistake or *fraud* without consent of both

parties)." *Sonder, supra* at 481, 549 A.2d at 159. (emphasis added)

Accordingly, the argument of defendant that this court is without subject matter jurisdiction is without merit.

## B. *This Action Is Foreclosed As Res Judicata By The Divorce Decree*

Next, the argument that the divorce decree is res judicata on the merits of this case before this court has no merit because the Montgomery County court did not purport to foreclose another court from reviewing a claim of fraud.

## SUBSTANTIVE FACTS

The substantive facts involved in this matter are as follows:

Plaintiff and defendant were married in 1984. In 1988, they invested $100,000 into ABC/ABFS Company, a privately held firm in Bala Cynwyd, Pennsylvania. The investment came at the urging of Beverly Santilli, a close childhood friend of defendant Glen Albert Nathan. (N.T. 1/10/00, p. 70; 1/11/00, p. 17; 1/12/00, p. 95.) (Anthony J. Santilli dep., p. 8.)

In April of 1993, plaintiff and defendant separated, with defendant moving out of the marital home. (N.T. 1/10/00, p. 76.) Defendant was the primary wage earner for the couple's income through his lucrative chiropractic practice. Defendant had managed the couple's finances, (N.T. 1/10/00, pp. 69, 71-76), had possession of the ABC/ABFS stock certificates (N.T. 1/12/00, p. 52), and the ABC/ABFS financial data at his chiropractic office. Plaintiff took care of the couple's two young chil-

dren. Plaintiff had no background in finances or investments (N.T. 1/10/00, p. 68), and she had always trusted and relied upon the defendant to handle the money.

After defendant moved out of the marital home, he stopped paying the mortgage and other bills. The bank began foreclosure proceedings on the marital home. (N.T. 1/10/00, p. 77.) Plaintiff was forced to file for Chapter 13 bankruptcy protection on April 13, 1994 (N.T. 1/10/00, p. 34; N.T. 1/11/00, p. 58) which delayed the foreclosure and on August 4, 1994, the house was ordered to be sold. (N.T. 1/11/00, p. 59.)

In March of 1995, plaintiff and her two children moved into a rented single home at 258 Harrison Avenue in Elkins Park, Pennsylvania. (N.T. 1/10/00, p. 79.) Defendant signed the lease for this rental property and defendant paid the rent. (N.T. 1/10/00, p. 80.) Plaintiff had no credit because of her bankruptcy filing. After plaintiff moved into the Harrison Avenue property, defendant told her that she had only one year to live in that home. (N.T. 1/10/00, p. 80.)

In the summer of 1995, plaintiff and defendant discussed dividing up whatever marital assets were left and getting legally divorced. (N.T. 1/10/00, pp. 80-81.) Defendant told her he wanted to "get this over and done with and maybe once it's over, and done with, we could get together again and be a family." (N.T. 1/10/00, p. 81.) He told her "he had broken up with his girlfriend and he didn't want his children to feel like third class citizens—he wanted to make it work." (N.T. 1/10/00, pp. 81-82.) Defendant told plaintiff "she needed to find another rental property. Unless I turned over 25 percent of my stock to him, he wasn't going to sign a lease on another home for me." (N.T. 1/10/00, p. 81.)

Defendant offered plaintiff $30,000 in exchange for wife-plaintiff's one-quarter interest in ABC/ABFS. Plaintiff testified:

"Question: Did you ask him what the stock was worth?

"Answer: Of course.

"Question: What did he tell you?

"Answer: He told me it was what we paid for it, and that it could be worthless someday. I'm getting a great deal.

"Question: Did you trust and believe him when he told you that?

"Answer: Yes.

"Question: Why?

"Answer: Because I wanted to. I trusted him because I wanted us to be a family.

"Question: Was he being civil with you at the time you had this discussion?

"Answer: Yes." (N.T. 1/10/00, pp. 81-82.)

Plaintiff testified she met with her attorney, Susan Gantman, Esquire, and discussed the $30,000 offer and Gantman told her in November of 1995:

"My lawyer told me that we could fight until we're blue in the face, and I could end up with nothing. If he was a rotten bastard, I better take what I can get." (N.T. 1/10/00, p. 82.)

Plaintiff also testified:

"Question: Did Glen want you to deal directly with him or did he want you to deal through your lawyer with him?

"Answer: He told me, let's not let the lawyers get all the money. Let's do this amicably and civil and we can do it together without any lawyers." (N.T. 1/10/00, p.

83.) Plaintiff testified she owed her lawyer, Sue Gantman, $10,000 at this time and defendant knew this. (N.T. 1/10/00, p. 83.)

On November 30, 1995, plaintiff met with her brother-in-law, Sam Brand, and prepared a four-page handwritten document. (P-21.) (N.T. 1/10/00, p. 85.) This document, together with a September 14, 1995 letter from David Grunfeld to Sue Gantman (P-23), all confirm plaintiff's agreement to sell her 25 percent interest in ABC/ABFS to defendant for $30,000 cash. (N.T. 1/10/00, pp. 86-89.)

Sue Gantman, Esquire, confirmed that Lauren and Glen entered into the agreement to sell her one-quarter interest in ABC/ABFS for $30,000 without the benefit of her as counsel. She testified that Lauren dealt with Glen on this deal.

"Question: You would agree, ma'am, that on November 29 or November 30, that Lauren and Glen entered into a handwritten agreement between themselves without counsel representing them, right?

"Answer: Correct . . .

"Question: The point is that they entered into that agreement without the benefit of you as counsel, is that right?

"Answer: Yes.

"Question: Lauren dealt directly with Glen on that deal. Isn't that true?

"Answer: That is true." (N.T. 1/11/00, pp. 103-104.)

The substance of those three (P-21, P-22, P-23) documents were then typed into a formal postnuptial agreement by the attorneys. This was identified as P-24. The postnuptial agreement was dated February 14, 1996 and

was signed by plaintiff and defendant. (N.T. 1/10/00, p. 89.)

After the formal postnuptial agreement was signed, defendant transferred the $30,000 cash payment to plaintiff's attorney, Sue Gantman, Esquire. Shortly after that, plaintiff received a phone call from defendant informing her that she was now a "rich lady." The testimony was as follows:

"Question: Did there come a point in time after Valentine's Day in 1996 when you learned the stock you just sold for $30,000 was worth more money?

"Answer: Yes.

"Question: When was that?

"Answer: I don't recall the exact date. My ex-husband called me and told me I was a rich lady.

"Question: He called you and told you were what?

"Answer: A rich lady.

"Question: You were what?

"Answer: A rich lady. I asked him what he meant. He told me the stock went public. Then I called my brother-in-law and asked him to find out about it. I also called my uncle who had—my uncle finally found out about the company, that it was trading on the Philadelphia Stock Exchange.

"Question: Had you ever heard the term IPO, or initial public offering before Glen called you?

"Answer: No.

"Question: Had you ever heard about a public offering of a stock?

"Answer: No." (N.T. 1/10/00, pp. 92-93.)

Upon learning that the stock had gone public and was now worth far in excess of what defendant had paid her,

she accused defendant of cheating her, and defendant replied, "That's the way it goes." (N.T. 1/10/00, p. 96.)

Plaintiff testified that she then called her attorney, Sue Gantman, Esquire, and asked her what her rights were. Susan Gantman, Esquire, met with her and had a nine-page petition prepared called a "Petition for special relief." (P-25.) This petition was prepared in November of 1996 setting forth all facts to try to undo the fraud that the defendant had committed. (N.T. 1/10/00, pp. 94-95; 1/11/00, p. 107.) This petition, however, was not filed by Susan Gantman, and Ms. Gantman referred plaintiff to another lawyer, Marvin Wilenzik, Esquire, and plaintiff then came to the office of Howard J. Levin, Esquire, for representation. (N.T. 1/10/00, p. 95.) As mentioned above, in the procedural section, plaintiff, through Howard J. Levin, Esquire, immediately filed a writ of summons in Common Pleas Court in Philadelphia against defendant, Glen Albert Nathan, defendant's attorney, David I. Grunfeld, Esquire, his attorney, and defendant, Susan Gantman, Esquire, believing at that time there were potential causes of action against Grunfeld for conspiracy to commit fraud, and against Susan Gantman, Esquire, for negligence in failing to investigate the rates of the stock. Once documentation was obtained from Susan Gantman, Esquire, she was dismissed, by agreement, from the case, before the complaint was filed. A dismissal of David Grunfeld occurred after discovery in the case was completed.

In 1988, when the $100,000 was invested into ABC, it was Beverly Santilli, the defendant's close friend, who initially approached defendant with the investment idea. Her husband, Anthony Santilli, was forming a new company and was looking for investors. The minimum in-

vestment was $35,000. (Anthony J. Santilli dep., p. 10.) The ABC/ABFS Company was a privately held firm and its business was to make loans to consumers and businesses. After defendant and Mr. Santilli met, defendant decided to invest $100,000 of marital funds into ABC/ABFS. This was a significant amount and made defendant one of the "largest" investors in the company. (N.T. 1/11/00, p. 19.) Defendant was therefore given the title of "assistant secretary of ABC/ABFS." (N.T. 1/11/00, p. 19.)

From 1988 through 1995, defendant was intimately familiar with the inner workings of ABC. He attended several board of directors' meetings. (N.T. 1/11/00, p. 20.) In addition, defendant received financial information from ABC/ABFS, year-to-date statements, unaudited financial statements, agendas of meetings, and draft public stock prospectuses. (N.T. 1/11/00, p. 31; 1/12/00, p. 48.) (A.J. Santilli dep., p. 40.) In addition, defendant was regularly on the premises of ABC/ABFS in Bala Cynwyd from the mid 1990s until 1999 (while the case was in suit) providing chiropractic services to ABC/ABFS employees for a fee. (N.T. 1/11/00, p. 70.)

Anthony J. Santilli, the chief executive officer of ABC/ABFS testified that defendant wanted to "stay close and watch" his investment (A.J. Santilli dep., pp. 11-12), and learn about the business. Being at the board of directors' meetings would allow defendant to learn. (A.J. Santilli dep., pp. 11-12.)

While defendant argues that "the record contains no evidence whatsoever" that defendant misrepresented the value of the stock (defendant brief at p. 5), the record establishes quite the contrary.

Plaintiff subpoenaed the ABC/ABFS documents. (See subpoenas P-20, and Robin Brown, Esquire, attorney for ABFS, letter of September 11, 1998, enclosing documents AB1-AB83.) The attorney for ABFS confirmed that the ABC/ABFS Company had produced all documents, evidencing the board of directors' meetings that defendant attended; the minutes of these meetings that he attended were where public stock equity offerings were discussed. (A.J. Santilli dep., pp. 25-28.)[2, 3]

Plaintiff presented clear and convincing evidence that defendant knew, from at least 1993, that ABC/ABFS stock was poised to go public and had a value far in excess of the "worthless" or "at best what we paid for it," *i.e.,* $100,000 value he told his wife.

Mr. Santilli testified that the minutes taken at the board meetings were accurate. (A.J. Santilli, p. 29.) He confirmed that defendant received balance sheets of ABC/

---

2. Below is a list of the documents of minutes of meetings reflecting where defendant was in attendance:

P-1—6/7/88
P-2—8/3/88
P-3—1/17/90
P-4—8/1/90
P-5—7/17/91
P-6—10/16/91
P-7—5/19/92
P-8—2/9/93
P-9—8/18/93
P-10—10/26/93
P-11—1/25/94
P-12—1/24/95
P-13—5/9/95

3. Also provided pursuant to the subpoenas were the charts of the comparisons of the requirements for listing ABFS on various stock exchanges, P-18 and P-41.

ABFS; year-to-end statements, and monthly statements of income (A.J. Santilli, p. 29) by virtue of having this special title, and being such a large investor.

Mr. Santilli established that the ABC/ABFS financial documents went to defendant at the defendant's chiropractic office address and not to his home. (P-14-P-15, A.J. Santilli, pp. 30-33.) Mr. Santilli sent defendant unaudited "For Management Purposes Only" financial documents because defendant: "was part of the, I guess, the body of people outside the company who had *inside information* because they are board members." (N.T. A.J. Santilli, p. 33.) (emphasis added)

Mr. Santilli testified that the agenda for the February 8, 1993 meeting, which defendant admitted receiving (N.T. 1/11/00, p. 22), stated that Mr. Santilli was going to review and discuss the first draft of the new equity prospectus for sale of stock to the public. (A.J. Santilli, pp. 34-36.) Defendant admitted receiving a copy of that prospectus, P-16. (N.T. 1/11/00, p. 31.)

The February 9, 1993 prospectus (P-16), discussed listing the company on the Nasdaq Exchange and confirmed a price to the public of $4 a share for the common stock. (A.J. Santilli, pp. 34-39.) Again, defendant admitted receipt of P-16 at the February 9, 1993 meeting. (N.T. 1/11/00, p. 31.) The minutes for this meeting state:

"Item no. 4: Review first draft of new equity offering. Mr. Santilli presented to the board a target of $1.5 million dollars in new equity. He also discussed positioning of the company as a new financial institution. The board adopted a resolution giving existing debtholders a 20 percent discount for the conversion of debt to equity." (N.T. 1/11/00, p. 32.)

Mr. Santilli confirmed that as of February 3, 1993, there was a "present intention" to list ABFS on the Nasdaq Exchange and confirmed a price to the public of $4 per share. (A.J. Santilli, pp. 38, 39.)

Plaintiff introduced P-17, the prospectus dated May 14, 1993 into evidence. (P-17.) (A.J. Santilli, p. 39.) This prospectus was also admitted as sent by Mr. Santilli to defendant (A.J. Santilli, p. 40) and received by defendant. (N.T. 1/12/00, p. 45.)

The May 14, 1993 prospectus also described the shares of ABFS being sold to the general public at $4 per share, and listed defendant, Glen Albert Nathan, and Mrs. Nathan, as owning 87,700 shares or 7 percent of the common stock in the company. Thus, defendant knew, at a minimum, that his jointly owned shares in ABFS were worth at least $350,800 based on 87,700 shares at $4 per share. This only increased in time with a three to two stock split which occurred in October of 1995. (N.T. 1/11/00, p. 32.)

The minutes for August 18, 1993 (P-9) have defendant as attending the meeting. Under item 3, it states:

"Discussed current stock equity offering. Mr. Santilli presented the status of the equity offering."

Defendant admitted Mr. Santilli presented the status of the public stock offering at the August 18, 1993 meeting. (N.T. 1/11/00, p. 32.)

Mr. Santilli also established the events which transpired in 1995. Defendant was present for the January 24, 1995 meeting. (P-12.) A chart of "Summary of financial requirements for initial listing," P-18, was dated March 31, 1995. This was produced by the ABFS attorneys in response to plaintiff's subpoena. P-18 was properly authenticated. Mr. Santilli testified this chart con-

tained the kinds of things that would have been part of a generalized discussion on May 9, 1995 at the board meeting (A.J. Santilli, p. 48), and testified that there was a "good chance" that the March 31, 1995 chart (P-18) may have been used at the May 9, 1995 meeting. (A.J. Santilli, pp. 46-49.) The chart, P-18, confirms, yet again, that the minimum bid price for the ABFS shares was being set internally in the company at $4 per share.

A similar chart, P-41, dated May 31, 1994, and produced by ABFS under the subpoena, also set the minimum bid price for ABFS stock at $4 per share.

Plaintiff's expert, Morris Gocial, CPA, was qualified as an expert in the field of preparing certified reports for public offerings as well as the determination of the business value of privately owned stock. (N.T. 1/11/00, p. 124.) Mr. Gocial testified that it could be many months to go public, three years on average, and as long as five years. (N.T. 1/11/00, pp. 119, 128.) He explained there was a minimum of three years of audited financial statements that the SEC requires before a company is allowed to go public. (N.T. 1/11/00, p. 128.)

Mr. Gocial explained how the minimum bid price is arrived at. (N.T. 1/11/00, p. 138.) His opinion was that the value of the common stock, while defendant and plaintiff were negotiating in November of 1995 up through February of 1996, was $10 to $17 a share. He gave an opinion that the value of the 147,824 ABFS common shares held by the Nathans on November 29, 1995, (after the 3/2 split) was $409,934 based on $10 a share, including interest (pp. 145, 147), or $722,241 based on $17 per share. (PP. 145, 147.) He testified that the damages would be similar as of February 14, 1996, the date that the postnuptial contract was actually executed.

Defendant, Glen Albert Nathan, admitted he came to the board of directors' meeting on May 9, 1995 and "there may have been an agenda at the place where I was sitting." (N.T. 1/11/00, p. 34.) He contends that he was asked to wait outside and then he left. (N.T. 1/11/00, p. 34.) He denied ever having seen the chart, P-18, prior to this lawsuit being instituted.

### C. *This Court Finds That It Properly Received Exhibits P-18 and P-41*

First, the P-18 and P-41 charts were produced pursuant to the subpoena served on ABC/ABFS. (See subpoena.) The letter of Robin Brown (P-20) confirms that 83 documents (AB-1 to AB-83) were produced pursuant to the subpoena. P-18 and P-41 were part of these documents. It was, thus, properly authenticated as a business record of ABFS or under Pa.R.E. 901, by Anthony Santilli, in his testimony, that it was something that he had reviewed which was probably used at the May 9, 1995 meeting.

P-18 and P-41 were clearly relevant to the issues being tried. They set forth the comparisons of various stock exchanges' requirements for the listing of an initial public offering on the various exchanges, and were testified to, would have been part of the discussions at these meetings. It was relevant for plaintiff's expert to rely upon same in expressing his opinion. It was relevant for purposes of Mr. Santilli's testimony as to what was discussed at the May 9, 1995 meeting.

Finally, there was simply no demonstrable overtly prejudicial effect of such evidence. Defendant had full opportunity to argue, and did, in fact, argue that the de-

fendant was not present on the May 9, 1995 meeting when P-18 was used. Defendant also argued that he had not seen either of these two charts until the discovery process in this case.

The Pennsylvania Rules of Evidence and the cases interpreting same provide an abundance of support for the admission of the charts P-18 and P-41 and for the jury's consideration of those exhibits as evidence in the case. To begin with, the documents were properly authenticated. Pa.R.E. 901 provides that the authentication requirement is satisfied by evidence to support a finding that the matter in question is what its proponent claims. To that end, Pa.R.E. 901(b) provides several illustrations for satisfying this requirement. Pa.R.E. 901(b) states that evidence is authenticated with testimony that a matter is what it is claimed to be. In addition, Pa.R.E. 901(b)(4) allows authentication through the appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

Not only did Anthony Santilli testify that the charts were what they were claimed to be, but he did so upon considering the circumstances surrounding the board meeting agendas where the discussion of the charts was identified. Pennsylvania law permits evidence to be authenticated by circumstantial evidence, including through testimony that an item of evidence is connected to a party, see *Commonwealth v. Bassi,* 284 Pa. 81, 130 A. 311 (1925), and through the identity established by the contents and circumstances of a conversation, or in this case a meeting, see *Bonavitacola v. Cluver,* 422 Pa. Super. 556, 619 A.2d 1363 (1993).

Defendant's real argument is that he claims he was not there when the charts were shown and therefore the

charts should not be admissible. Therefore, defendant would have this court determine, as a matter of law, that because he was not present, that the charts are inadmissible. This was a fact issue for the jury to decide and they did so. Once properly authenticated, the court properly allowed the jury to weigh the credibility and sufficiency surrounding this evidence.

## D. *Judgment N.O.V.*

On the issues of judgment n.o.v. and a new trial, this court adopts the well-reasoned arguments of counsel for plaintiff set forth in his brief as compelling.

It is fundamental that on a motion for judgment n.o.v., the court is obligated to view the evidence and all reasonable inferences that arise from the evidence in the light most favorable to plaintiff, the verdict winner. *Niles, supra.*

Defendant argues that there is "no evidence whatsoever" that defendant "either misrepresented the value of the stock in ABC/ABFS or made a fraudulent assertion related thereto." (Defendant brief at 5.)

Defendant omits plaintiff's testimony at N.T. 1/10/00 at 81 that defendant told her the stock was "worth what we paid for it and it could be worthless someday. I'm getting a great deal." Defendant ignores that he was in possession of the actual stock certificates from the time they were obtained and never disclosed the precise number of shares held by the couple prior to November 30, 1995, or in between November 30, 1995 and February 14, 1996. (N.T. 1/12/00, pp. 52-53, 88.) Plaintiff learned *after the stock went public on May 13, 1996,* that the couple held 147,824 shares at the time of the negotia-

tions of November 30, 1995 and February 14, 1996. Thus, defendant, by placing a value of $100,000 on 147,824 shares, in effect, valued the shares at 68 cents per share when, in reality, the stock began trading on the Philadelphia Exchange on May 13, 1996 between a low of $10 and a high of $17 per share.

Defendant ignores the testimony of plaintiff's expert, Morris Gocial CPA, and Anthony Santilli, as well as the documents themselves that the ABFS common stock was valued internally at the ABFS Company beginning in 1993 at $4 per share. (P-16 prospectus February 9, 1993; admitted received by defendant (N.T. 1/11/00, p. 31); P-17 prospectus of May 14, 1993; admitted received by defendant (N.T. 1/12/00, p. 45); P-41—5/31/94 ABFS chart; P-18—3/31/95 ABFS chart). Thus, the value was not $100,000, what they "paid for it" or "worthless" or "unknown," even before the three to two split in October of 1995. Defendant knew, because the documents tell us he knew as early as 1993, that there were 87,700 shares owned. At $4 a share, this is a value of $350,800. By November of 1995, after the three to two split, the defendant knew because he was in possession of the certificates that 147,824 shares at $4 per share was worth $591,296, at a minimum, not the $100,000 he falsely asserted. Plaintiff proved through her expert it was actually worth quite more—$10 to $17 per share.

Defendant also ignores the testimony of Morris Gocial CPA, that it takes a company three years average to complete the public offering, and sometimes as long as five years. Thus, by 1993, the defendant knew that the company was poised to go public and management was waiting for the best time to do it. Defendant also knew that

he would make a significant return on his initial investment of at least three and a half times what he paid for it. In fact, Mr. Gocial testified the total value of the investment by 1995 was 25 times what the couple bought it for.

There is clear and convincing evidence that defendant had the scienter or intent to deceive plaintiff. Not only did the jury find the intent to deceive by special jury interrogatories, it also found the defendant liable for punitive damages. Punitive damages, by definition as the court set forth in its charge, was that the defendant's conduct had to be outrageous or acted with a bad motive or reckless indifference to the plaintiff. (N.T. 1/13/00, p. 39.)

Defendant contends he did not know the value of the stock; he thought it was essentially worthless; he didn't know it was going to go public and he didn't intend to deceive plaintiff. The jury clearly disbelieved him. The verdict was not based upon any speculation. It was based upon oral testimony in which they evaluated the credibility of the various witnesses and upon the documentation itself.

Defendant's testimony on these very issues lacked credibility. Defendant testified that despite being present at all of the board of directors' meetings, except one (N.T. 1/11/00, p. 27), he really didn't understand what was being discussed. He testified that he just knew the company was running out of money, "it scared me, it made me skeptical of the future, if any, long term." (N.T. 1/11/00, pp. 45-46.) Defendant testified he "always" felt the company was on the "verge of going under" and the $100,000 investment was "worth nothing." (N.T. 1/11/

00, pp. 46 and 47.) Yet, despite this, defendant invested $3,000 to $6,000 of his daughter Arielle's college fund into the ABFS Company. (P. 48.) Common sense tells you, you do not invest your child's future into a company if you truly believe it is on the verge of going under. Moreover, defendant kept his wife in the dark by not telling her he invested their daughter's college fund in ABC/ABFS. (N.T. 1/12/00, p. 96.)

Defendant also testified that despite receiving financial documents, year-to-date statements from 1988 to 1995, he didn't understand them. He contended he didn't even know what a year-to-end statement was. He emphatically stated it was something "totally foreign to what I dealt with on a day to day basis." (N.T. 1/11/00, p. 41.) When defendant was confronted with his own year-to-date statements from his own chiropractic practice for 1993 and 1994, (P-37), he conceded "generally, I know what they are." But contended "I don't understand them." (N.T. 1/11/00, p. 43.)

In sum, there was indeed clear and convincing evidence that the defendant misrepresented the value of the stock to plaintiff and did it with the intent to deceive. It was not mere coincidence that he struck the deal with plaintiff alone, outside her lawyer (N.T. 1/11/00, p. 104) using the economic power of refusing to sign a lease until the deal was concluded on November 30, 1995 and the stock began trading on May 13, 1996.

P-28, the letter from David Grunfeld to Susan Gantman of November 28, 1995, stated "Glen will not sign the lease or borrow the funds without an overall agreement. Lease offer is open until Thursday late, so perhaps we can do that." The testimony was clear that plaintiff

was in economic distress by defendant and she and her children moved out of the Harrison Avenue home and took possession of a new apartment on Walker Avenue on December 1, 1995. Only after defendant struck his favorable deal of $30,000 for one-quarter of her interest did defendant sign and prepay for the Harrison Avenue lease.

Thus, when the facts are viewed in the light most favorable to the verdict winner, it is clear that there was ample and sufficient evidence for this jury to conclude that there was a fraudulent misrepresentation, with intent to deceive, with justifiable reliance, causing plaintiff harm.

## E. *New Trial*

On the issue of entitlement to a new trial, defendant argues that the verdict is against the weight of the evidence. Defendant argues that since plaintiff was represented by Susan Gantman and Gantman sent her the February 8, 1995 letter from ABFS to Grunfeld advising that ABFS was not in the position to determine the value of the stock, that a new trial is in order. This is clearly wrong. Plaintiff testified she never received this letter (N.T. 1/10/00, p. 101) and there was no letter from Susan Gantman enclosing that to her.

Defendant argues that D-10 and D-11, the two Susan Gantman letters of November 19, 1995, are "unequivocal" that the property settlement was not a fair and equitable agreement. (Defendant brief, p. 16.) This argument also fails. Susan Gantman testified that plaintiff came in that day and wanted to get the agreement done that day. (November 29, 1995.) "I was concerned. I didn't

think she should sign an agreement that day." (N.T. 1/10/00, p. 97.)

The plaintiff's recollection of the meeting was different. She testified on cross-examination that Sue Gantman "took me into a closed room and told me we could fight until I was blue in the face and wind up with nothing. This was his offer and I should take it." (N.T. 1/10/00, p. 112.) Plaintiff's testimony must be viewed in the context of the economic duress the defendant was utilizing of threatening no lease unless there was an overall deal. (See P-28.) Sue Gantman did confirm that Lauren and Glen cut their own deal and Lauren did not rely on her lawyer. (N.T. 1/11/00, p. 104.) At best, what defendant is arguing is a mere conflict of the testimony between plaintiff and her lawyer. This is not a reason to order a new trial.

There is also evidence that after learning of the fraud that had been committed upon plaintiff, Susan Gantman, Esquire, prepared the petition for special relief. (P-25.) (N.T. 1/11/00, pp. 107-110). Why would an attorney prepare a petition laying out all factual averments of the fraud defendant committed not only to the plaintiff client, but to Susan Gantman as well, put it on her pleading paper, as an officer of the court, unless she believed it to be true? The simple truth of the matter is that defendant, Glen Nathan, deceived and tricked his own lawyer, Grunfeld, as to the value and number of shares, opposing counsel Gantman and plaintiff.

Defendant also argues that D-4, the letter from David Grunfeld of March 10, 1995 discussing the possibility that the stock could go public, is the basis for a new trial. This is also wrong. Defendant characterized this evidence as "extremely compelling" evidence. (Defendant brief,

p. 16.) Defendant fails to cite that Sue Gantman admitted as follows:

"Question: When you received David Grunfeld's March 10, 1995 letter, did you ask him in writing who the underwriters were?

"Answer: Who the underwriters of what were?

"Question: Of ABC, in case it could go public.

"Answer: No, sir.

"Question: Did you ask Mr. Grunfeld in writing when you got that letter whether any offering was about to be made or was going to be made?

"Answer: No, sir.

"Question: Did you ask Mr. Grunfeld in writing the size of any possible offering?

"Answer: No, sir.

"Question: So it is true, Ms. Gantman, you didn't ask in writing because you didn't think this company was about to go public? Is that fair?

"Answer: No sir. I didn't have any idea if it was about to go public.

"Question: Isn't it true that as a divorce practitioner representing clients who have an interest in privately held companies that you always are aware of the possibility that the company could go public?

"Answer: Yes.

"Question: When dealing, Ma'am with a privately held stock, isn't it true you *automatically* talk about it going public?

"Answer: Yes." (N.T. 1/11/00, pp. 100-101.) (emphasis added) It is submitted this is precisely what a "CYA" letter is.

David Grunfeld testified similarly that he had no "inkling" that this company was going to go public when

he wrote that March 10, 1995 letter. (N.T. 1/12/00, p. 84.)

Defendant argues plaintiff's position is convenient but not credible. How is it not credible when the two divorce practitioners both agreed that they knew nothing specific about this ABC/ABFS Company going public, and they always, when dealing as divorce practitioners with *any* privately held company, always do a letter to cover themselves? The letters are therefore not "extremely compelling."

Finally, defendant argues that Beverly Santilli's testimony should grant them a new trial. Defendant argues that Ms. Santilli testified that defendant would "absolutely not" be present during any discussion regarding the company going public. This argument is of no merit. The jury was allowed to consider the weight, bias, demeanor and favoritism of this person testifying. The court will recall she was a close childhood friend of defendant, went out socially with him before stock was purchased, during the time he held the stock and was married, and after a separation. In fact, she went out with defendant Nathan during the pendency of this lawsuit. (Beverly Santilli dep., pp. 11-18.) It was, thus, the jury's prerogative to attach whatever weight to her testimony it saw fit, and this is not the basis for a new trial.

Accordingly, there is no basis for judgment n.o.v. or for a new trial.

No error has been committed by this court.